DAVID L. HENKIN (HSBA #6876)
[*Pro Hac Vice* Admission Forthcoming]
EARTHJUSTICE
850 Richards St., Suite 400
Honolulu, HI 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org

THIEN T. CHAU (CSBA #330315)
[*Pro Hac Vice* Admission Forthcoming]
EARTHJUSTICE
1001 G St., NW, Suite 1000
Washington, D.C. 20001
T: (202) 745-5226
Email: tchau@earthjustice.org

RACHEL M. TAIMANAO-AYUYU (GBA #07097)
THE LAW OFFICE OF RACHEL TAIMANAO-AYUYU
130 Aspinall Ave., Ste. 2D
Hagåtña, GU, USA 96910
T: (671) 989-0559
Email: rachel@guamcounsel.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF GUAM

| | |
|---|---|
| PRUTEHI LITEKYAN: SAVE RITIDIAN, ) | CIVIL NO. |
| ) | |
| Plaintiff, ) | COMPLAINT FOR DECLARATORY |
| ) | AND INJUNCTIVE RELIEF |
| vs. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| THE AIR FORCE; FRANK KENDALL, ) | |
| Secretary of the Air Force; UNITED ) | |
| STATES DEPARTMENT OF DEFENSE; ) | |
| and LLOYD AUSTIN, Secretary of ) | |
| Defense, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiff Prutehi Litekyan: Save Ritidian ("Prutehi Litekyan") complains of defendants United States Department of the Air Force; Frank Kendall, in his official capacity as Secretary of the Air Force; United States Department of Defense; and Lloyd Austin, in his official capacity as Secretary of the Department of Defense (collectively, "Defendants") as follows:

## INTRODUCTION

1.     By this Complaint, Prutehi Litekyan seeks to compel Defendants to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, prior to conducting open burning and open detonation ("OB/OD") of hazardous waste munitions at the Explosive Ordnance Disposal Range ("EOD Range") on Tarague Beach at Andersen Air Force Base ("AFB"), Guam.

2.     On May 17, 2021, Andersen AFB submitted to the Guam Environmental Protection Agency ("Guam EPA") an application for a three-year renewal of its Hazardous Waste Management Facility Permit for OB/OD operations at the EOD Range. The application acknowledges that OB/OD operations may adversely affect culturally significant sites, the marine environment, groundwater quality, and endangered species, among other things. Despite these potential impacts, Andersen AFB failed to prepare any NEPA analysis to (1) take the requisite "hard look" at the environmental impacts of the proposed OB/OD operations, (2) consider a reasonable range of environmentally preferred alternatives, including the "no action" alternative, and (3) provide opportunities for public comment on the proposed OB/OD operations and reasonable alternatives, in violation of NEPA.

3.     The Air Force proposes to treat hazardous waste munitions at the EOD Range by blowing up waste munitions directly on the sand and burning waste munitions in the open air. By

definition, *open* burning and *open* detonation both release the toxic by-products of burning and detonation—and sometimes unexploded ordnance—directly into the surrounding environment.



Detonation of M117 Bomb at EOD Range, Andersen AFB (Apr. 5, 2002),
*available at* https://catalog.archives.gov/id/6627544 (last visited January 23, 2022)

4. The EOD Range sits above the island's sole-source aquifer and is immediately adjacent to the Pacific Ocean and near culturally significant fishing locations—on which local families depend for food—and sites for collecting traditional medicine. The beach where the EOD range is located is nesting habitat for the endangered green sea turtle (*Chelonia mydas*), and migratory birds frequent the EOD Range.

5. The EOD Range sits on ancestral land that the military seized from local families after World War II. OB/OD operations could permanently contaminate the area with toxic

chemicals and unexploded ordnance, effectively precluding the return of these lands to the original owners.

6.    Allowing Defendants to proceed with renewal of the hazardous waste permit for OB/OD operations at Andersen AFB, without an analysis of the environmental impacts and alternatives, would violate NEPA's fundamental purpose to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a).

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction over the claims for relief in this action pursuant to 5 U.S.C. §§ 701–706 (actions under the Administrative Procedure Act ("APA")); 28 U.S.C. § 1331 (actions arising under the laws of the United States); 28 U.S.C. § 1361 (actions to compel an officer of the United States to perform his duty); and 28 U.S.C. §§ 2201–02 (power to issue declaratory judgments in cases of actual controversy).

8.    Venue lies properly in this judicial district by virtue of 28 U.S.C. § 1391(e)(1) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and Plaintiff resides here.

## PARTIES

Plaintiff

9.    Plaintiff Prutehi Litekyan: Save Ritidian is a non-profit corporation based in Guam. Its mission is to protect natural and cultural resources in all sites identified for military live-fire training in Guam for the well-being of the people and future generations of Guam.

Prutehi Litekyan seeks to prevent environmental degradation and destruction on sacred and native lands and is dedicated to the return of ancestral lands to their original owners.

10.     Prutehi Litekyan engages with the community in Guam to promote the protection of the island's sole-source aquifer, sacred sites and ancestral remains, and access to family and ancestral lands. Prutehi Litekyan also advocates for the protection of environmental and cultural resources, including, but not limited to, endangered species, traditional fishing sites, and sites for cultivating and gathering traditional medicines. Prutehi Litekyan's mission includes protection of these resources from adverse impacts resulting from Department of Defense ("DOD") activities and operations.

11.     Prutehi Litekyan conducts research and carries out public education efforts on these issues to help the community become better informed to participate in local and national processes regarding DOD activities and operations that may be harmful to Guam. Prutehi Litekyan also educates community leaders to encourage development of policies that prevent environmental degradation and ancestral desecration resulting from DOD activities and operations.

12.     In response to the proposed OB/OD operations at the EOD Range on Andersen AFB, Prutehi Litekyan and its members have continued to advocate for the protection of Guam's cultural and natural resources and ancestral lands. In October 2021, Prutehi Litekyan submitted a letter to the Guam EPA Administrator, urging the agency to deny Andersen AFB's application for renewal of the hazardous waste permit for OB/OD operations at the EOD Range. Among other things, Prutehi Litekyan pointed to the harm that OB/OD activities would cause to land and water along the northern coastline, including the island's sole-source aquifer.

4

13.     Prutehi Litekyan's members have cultural, social, spiritual, health, professional, scientific, recreational, aesthetic, economic, and other interests in the preservation of the cultural and natural resources in and around the EOD Range.

14.     Prutehi Litekyan's members include the family of original, indigenous owners of land that was seized by the U.S. military following World War II, including land near to the EOD Range. They also include current owners of land along the northern coast of Guam. Prutehi Litekyan's members are concerned that OB/OD operations will permanently contaminate the ancestral lands that they are actively advocating to be returned to their families. The proposed OB/OD operations would harm their cultural, spiritual, recreational, aesthetic, economic, and other interests in their ancestral land.

15.     Prutehi Litekyan's members frequently spend time on Tarague Beach, including at the Sirena Beach Pavilion, and intend to continue to use and enjoy the beach in the future. They are concerned that OB/OD activities on Tarague Beach will contaminate the sacred land and water where they and their families go for recreational, cultural, spiritual, and aesthetic purposes. They also are concerned that contamination of the ocean from toxic by-products of OB/OD and unexploded ordnance will threaten the health of the members and their families. Further, the explosions, smoke, and noise from OB/OD operations will interfere with Prutehi Litekyan's members' use and enjoyment of the area.

16.     Prutehi Litekyan's members include fishers who regularly rely on culturally significant fishing sites in the ocean adjacent to the EOD Range to harvest food for their families and intend to continue using these fishing sites in the future. They are concerned that OB/OD activities will contaminate the waters where they fish with toxic by-products of OB/OD and unexploded ordnance, thereby threatening these culturally significant sites and their health.

Further, during open burning and open detonation, Prutehi Litekyan's members would be prohibited from accessing traditional fishing sites that are within the 2,400 foot-radius safety zone proposed for OB/OD operations. The proposed OB/OD operations would harm these members' cultural, recreational, health, aesthetic, and other interests in fishing near the OB/OD area.

17.     Prutehi Litekyan's members include wildlife biologists in Guam who conduct research on the island's endangered green sea turtles. They are concerned that impacts from OB/OD activities, including, but not limited to, shockwaves from explosions on the beach where the turtles nest and contamination of the marine environment, will harm the turtles and thus harm the members' professional and scientific interest in studying the species.

18.     The aforementioned cultural, social, spiritual, health, professional, scientific, recreational, aesthetic, economic, and other interests of Prutehi Litekyan and its members in Guam will be adversely affected and irreparably injured by the proposed OB/OD operations at the EOD Range on Andersen AFB. Prutehi Litekyan and its members will suffer these irreparable unless Defendants revisit their decision to seek renewal of the Hazardous Waste Management Facility Permit for OB/OD operations at the EOD Range based on environmental review that complies fully with NEPA, including consideration of the impacts of Defendants' proposed action and reasonable alternatives that could accomplish Defendants' goals with less environmental harm.

Defendants

19.     Defendant United States Department of the Air Force is an agency of the United States Department of Defense. The Air Force is responsible for complying with NEPA prior to making decisions regarding treatment of hazardous waste at Andersen AFB.

20.     Defendant Frank Kendall is sued in his official capacity as Secretary of the Air Force and is the highest-ranking official within the United States Department of the Air Force.

21.     Defendant United States Department of Defense is the federal agency with ultimate responsibility for implementing and enforcing compliance with provisions of law that have been violated as alleged in this Complaint.

22.     Defendant Lloyd Austin is sued in his official capacity as the Secretary of the Department of Defense.

## STATUTORY AND REGULATORY FRAMEWORK

Purpose of NEPA and Obligation to Prepare a NEPA Analysis

23.     Congress enacted the National Environmental Policy Act "to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Compliance with NEPA prior to taking a proposed action is necessary to achieve Congress' declared purpose to "encourage productive and enjoyable harmony between man and his environment" and "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321.

24.     The Council on Environmental Quality ("CEQ") has promulgated rules implementing NEPA that apply to all federal agencies, including the Air Force. 40 C.F.R. § 1500.3(a); *see generally* 40 C.F.R. subch. A. In addition, the Air Force has promulgated its own

7

rules "to achieve and maintain compliance with NEPA and the [CEQ] Regulations" for implementing NEPA. 32 C.F.R. § 989.1(b); *see generally* 32 C.F.R. pt. 989.

25.     NEPA's policy goals are "realized through a set of 'action-forcing' procedures that require that agencies take a '"hard look" at environmental consequences' . . . and that provide for broad dissemination of relevant environmental information." *Robertson*, 490 U.S. at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

26.     NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "*Major Federal action* or *action* means an activity or decision subject to Federal control and responsibility" and "may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies." 40 C.F.R. § 1508.1(q)(2). The term "*[h]uman environment* means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." *Id.* § 1508.1(m). "*Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives." *Id.* § 1508.1(g). "Effects include ecological, . . . aesthetic, historic, cultural, economic, . . . social, or health effects. *Id.* § 1508.1(g)(1).

27.     When an agency does not know whether the effects of its action will be "significant," it may prepare an environmental assessment ("EA") to help make that determination. *Id.* § 1501.5(a). "[I]f the agency determines, based on the [EA], not to prepare an [EIS] because the proposed action will not have significant effects," then the agency must prepare a "finding of no significant impact" ("FONSI"). *Id.* § 1501.6(a). If the EA indicates that

the federal action "[i]s likely to have significant effects," the agency must prepare an EIS. *Id.* §
1501.3(a)(3).

28.    Agencies must identify in their NEPA regulations "categories of actions that
normally do not have a significant effect on the human environment, and therefore do not require
preparation of an [EA] or [EIS]." *Id.* § 1501.4(a). To invoke a categorical exclusion, the agency
must make an express determination that "a categorical exclusion identified in its agency NEPA
procedures covers [the] proposed action." *Id.* § 1501.4(b). Moreover, prior to relying on a
categorical exclusion, the agency must "evaluate the action for extraordinary circumstances in
which the normally excluded action may have a significant effect" and thus require an EA or
EIS. *Id.*; *see also* 32 C.F.R. pt. 989, app. B at A2.2 ("Circumstances may arise in which usually
categorically excluded actions may have a significant environmental impact and, therefore, may
generate a requirement for further environmental analysis.").

29.    NEPA mandates that agencies "'consider every significant aspect of the
environmental impact of a proposed action'" and "take a 'hard look' at [those] environmental
consequences ***before*** taking a major action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def.
Council, Inc.*, 462 U.S. 87, 97 (1983) (citations omitted; emphasis added). The Air Force's
NEPA regulations further provide that "Air Force personnel will . . . [r]eview the specific
alternatives analyzed in the [environmental impact analysis process] when evaluating the
proposal ***prior to*** decisionmaking." 32 C.F.R. § 989.4(d) (emphasis added). Additionally, "[e]ach
office, unit, single manager, or activity at any level that initiates Air Force actions is responsible
for . . . ensuring that, until the [environmental impact analysis process] is complete, resources are
not committed prejudicing the selection of alternatives nor actions taken having an adverse
environmental impact or limiting the choice of reasonable alternatives." *Id.* § 989.3(d)(3).

<u>Required Scope of NEPA Analysis</u>

30.     An EA is a concise document that must "[b]riefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives, and include a list of agencies and persons consulted." 40 C.F.R. § 1501.5(c)(2). The Air Force's NEPA regulations specify that alternatives considered must include the "no action" alternative." 32 C.F.R. § 989.14(d). The EA also must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1501.5(c)(1). "Every EA must lead to either a FONSI, a decision to prepare an EIS, or no action on the proposal." 32 C.F.R. § 989.14(a).

31.     An EIS must discuss "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

32.     The EIS must "provide full and fair discussion of significant environmental impacts and [must] inform decision makers and the public of the reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. In the alternatives section, the EIS must "[d]iscuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits." *Id.* § 1502.14(b). Alternatives analyzed must "[i]nclude the no action alternative." *Id.* § 1502.14(c). Air Force NEPA regulations specify that the Air Force must "analyze reasonable

10

alternatives to the proposed action and the 'no action' alternative in all EAs and EISs, as fully as the proposed action alternative." 32 C.F.R. § 989.8(a).

33.     "The statutory requirement that a federal agency contemplating a major action prepare . . . an environmental impact statement serves NEPA's 'action-forcing' purpose in two important respects." *Robertson*, 490 U.S. at 349 (internal citations omitted). First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* Second, "it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.*

Public Involvement in NEPA Process

34.     Preparing an EA or EIS provides important opportunities for public involvement in federal agency decision-making, and NEPA commands federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions." 40 C.F.R. § 1506.6(b).

35.     "NEPA's public comment procedures are at the heart of the NEPA review process." *State of Cal. v. Block*, 690 F.2d 753, 770-71 (9th Cir. 1982). "This reflects the paramount Congressional desire to internalize opposing viewpoints into the decision-making process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision." *Id.* at 771. "To effectuate this aim, NEPA requires not merely public notice, but public participation in the evaluation of the environmental consequences of a major federal action." *Id.*

36. "As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an [EIS]," an agency must publish in the Federal Register a Notice of Intent to prepare an EIS. 40 C.F.R. § 1501.9(d). After publishing the notice, an agency normally must invite the public to participate in "scoping," which is "an early and open process to determine the scope of issues for analysis in an [EIS], including identifying the significant issues and eliminating from further study non-significant issues." *Id.* § 1501.9(a); *see also id.* § 1501.9(b).

37. The agency then prepares a draft EIS "in accordance with the scope decided upon in the scoping process" and circulates the draft EIS for public review. *Id.* § 1502.9(b); *see also id.* § 1502.20. The agency must seek public comments on the draft EIS, "affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action." *Id.* § 1503.1(a)(2)(v).

38. The agency must "consider substantive comments timely submitted during the public comment period" and respond to these comments in the final EIS. *Id.* § 1503.4(a); *see also id.* § 1502.9(c). "In the final [EIS], the agency may respond by:"

(1)     Modifying alternatives including the proposed action.

(2)     Developing and evaluating alternatives not previously given serious consideration by the agency.

(3)     Supplementing, improving, or modifying its analysis.

(4)     Making factual corrections.

(5)     Explaining why the comments do not warrant further agency response, recognizing that agencies are not required to respond to each comment."

*Id.* § 1503.4(a).

39. Agencies also must "involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental

12

assessments." 40 C.F.R. § 1501.5(e); *see also* 32 C.F.R. § 989.14(l) ("The Air Force will involve other federal agencies, state, Tribal, and local governments, and the public in the preparation of EAs").

## **FACTUAL BACKGROUND**

OB/OD Operations at Andersen Air Force Base

40.      In its May 17, 2021, application to renew its Hazardous Waste Management Facility Permit, Andersen AFB proposes to open detonate approximately 30,000 pounds and open burn approximately 5,000 pounds of hazardous waste munitions each year at the EOD Range. The range is located on Tarague Beach, just before Tagua Point, and is defined as "the open beach area bounded by the Pacific Ocean to the north and the jungle and/or limestone to the east, south, and west."

41.      The Air Force proposes to open detonate hazardous waste in two pits at the eastern edge of Tarague Beach. Open detonation operations consist of placing hazardous waste munitions directly on the sand, adding an explosive charge to detonate the waste munitions (if required) and an igniter to initiate the detonator, and then setting off the detonation from a personnel bunker.

42.      The Air Force also proposes to open burn hazardous waste on Tarague Beach near the open detonation pits at a location that is only about 80 feet from the jungle and 150 to 190 feet from the Pacific Ocean. While the Air Force's permit renewal application does not detail with specificity the "metallic containment device" proposed for open burning operations, the DOD defines open burning as an "open-air combustion process by which excess, unserviceable, or obsolete munitions are destroyed." Prior to going inactive nearly two decades ago, open burning operations at Andersen AFB consisted of putting wood in a "burn kettle" (a former

13

aboveground fuel storage tank that was cut in half and placed on end, so that it was open to the air), adding waste munitions, placing a remote-controlled ignition device, pouring ten to twenty gallons of diesel fuel into the burn kettle, and then remotely activating the ignition device from a personnel bunker.



Figure 1-1: Location Map of OB/OD Range, AAFB, Guam

Appendix M to Andersen AFB Application for Hazardous Waste Management Facility Permit

43.     The Air Force seeks to "open burn/open detonate at the OB/OD unit hazardous wastes . . . that consist of common military ordnance material (such as black powder, white/red phosphorus, tear gas, ammunitions, propellants, and explosive materials)."

44.     Because of the inherent hazards associated with OB/OD, a 2,400 foot-radius safety zone surrounds the EOD Range, extending into the adjacent reef and ocean.



**Figure 2-12**
**EOD Range with 2400' Safety Zone**
Andersen Air Force Base, Guam

Appendix G to Andersen AFB Application for Hazardous Waste Management Facility Permit

45.     Andersen AFB first received a Hazardous Waste Management Facility Permit for its OB/OD operations at the EOD Range in 1982. Every three years since then, the Air Force has applied to renew this permit, and the Guam EPA has approved each of those permit renewals. Although open detonation has been occurring under each permit renewal, open burning operations have been inactive since at least before May 2002. The burn kettle previously used for open burning is not operational due to severe corrosion, and the Air Force proposes to construct a new device to restart open burning operations.

OB/OD Operations Have the Potential for Significant Impacts

46.     Andersen AFB's application to renew the Hazardous Waste Management Facility Permit for OB/OD operations at the EOD Range acknowledges the potential for impacts to the human environment. For example, the application states that "[t]he Permittee shall construct, maintain, and operate the facility to ***minimize the possibility*** of an unplanned fire, explosion, or any unplanned, sudden or non-sudden release of hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment," but notably does not claim that these adverse environmental impacts can be eliminated. (Emphasis added). On the contrary, the application acknowledges that "[p]revious DOD studies of open burning units on the ground that had been operating a number of years have shown that contaminated soils and residues were present in the immediate vicinity of the OB unit."

47.     The application notes that "[t]he nature of OB/OD [hazardous waste] treatment on the EOD Range does not provide for procedures to minimize releases to the atmosphere" and that it is not possible to "completely prevent the ejection of wastes," such as ash and other residue, during open burning.

16

48.     During open burning operations, fuel could spill directly on the beach, and the application acknowledges the possible need for an environmental response that would be beyond the capabilities of EOD personnel, requiring activation of the Base environmental spill team by the Fire Department.

49.     The application acknowledges the potential for OB/OD operations to contaminate the shallow, unconfined aquifer beneath the EOD Range, which supplies more than eighty percent of Guam's population with drinking water. Further, OB/OD operations could release contaminants into the adjacent Pacific Ocean and reef, threatening the health of local families that recreate at Tarague Beach and fish near the reef. Portions of the EOD Range also are susceptible to flooding during typhoons or from tidal waves, and unexploded ordnance and fragments of hazardous waste munitions could be washed into the ocean.

50.     OB/OD operations at the EOD Range present potential fire hazards, including uncontrolled fires. The application notes that "[f]ires involving explosives are extremely dangerous and can react in an unpredictable manner," and "[s]ome explosives exposed to fire will burn, detonate, or a combination of both."

51.     The application acknowledges potential hazards from OB/OD operations that could remain at the EOD Range long after its closure. For example, "[i]f buried [unexploded ordnance] cannot be removed or disposed of safely, it will remain in place" and a deed restriction will be placed on the property. The application further notes the potential for contamination with hazardous chemicals. Continued OB/OD operations at the EOD Range could cause permanent contamination of the area and jeopardize the return of these ancestral lands to the indigenous families that previously owned them.

17

52. The application acknowledges the potential impacts to imperiled species from OB/OD operations at the EOD Range, such as the endangered green sea turtles that nest on "[t]he beach adjacent to the OB/OD area." Explosions from OB/OD operations would subject endangered turtles' nests and the eggs they contain to ground shocks. The blasts from OB/OD also would threaten migratory seabirds that are frequently observed foraging and resting within the EOD Range, including the Common Sandpiper (*Actitis hypoleucos*), Ruddy Turnstone (*Arenaria interpres*), Pacific Golden Plover (*Pluvialis fulva*), Wandering Tattler (*Tringa incana*), and the Wedge-tailed Shearwater (Puffinus pacificus). The application acknowledges the potential for OB/OD activities to kill or injure migratory birds.

Alternatives to OB/OD to Treat Hazardous Waste Munitions

53. There are several alternative technologies available to treat hazardous waste munitions at Andersen AFB that would be less harmful to the human environment than OB/OD. In 2019, the National Academies of Sciences, Engineering, and Medicine ("NAS") published a report on "Alternatives for the Demilitarization of Conventional Munitions." In that report, the NAS concluded that "[v]iable alternative technologies exist within the demilitarization enterprise . . . for almost all munitions currently being treated within the DOD conventional munitions demilitarization stockpile via OB/OD." Further, "there are no significant technical, safety, or regulatory barriers to the full-scale deployment of alternative technologies for the demilitarization of the vast majority of the conventional waste munitions, bulk energetics, and associated wastes." Prutehi Litekyan is informed and believes, and on the basis therefor alleges, that the NAS determined that alternative technologies are suitable to treat the types of munitions that Defendants seek to treat with OB/OD at Andersen AFB.

54. The NAS concluded that, as compared to OB/OD, all the alternative technologies it reviewed would have "lower emissions and less of an environmental and public health impact."

55. Also in 2019, the U.S. EPA published a report on "Alternative Treatment Technologies to Open Burning and Open Detonation of Energetic Hazardous Wastes," which concluded that "safe alternatives exist and are being used to divert energetic hazardous wastes away from OB/OD." The U.S. EPA further stated that it "seeks to promote the development, testing, and use of alternative technologies that are capable of safely treating munitions and other explosive waste in a manner that reduces the potential for exposure and environmental contamination, as well as keeping cleanup and closure obligations to a minimum."

<u>Defendants' Failure to Conduct NEPA Analysis for OB/OD Operations at Andersen AFB</u>

56. Plaintiff Prutehi Litekyan is informed and believes, and on the basis therefor alleges, that, prior to making a decision to seek renewal of the Hazardous Waste Management Facility Permit for OB/OD operations at Andersen AFB and submitting their application to the Guam EPA on May 17, 2021, Defendants (1) did not make an express finding that any categorical exclusion covers the proposed action; and (2) did not consider whether extraordinary circumstances exist that would preclude application of a categorical exclusion.

57. Plaintiff Prutehi Litekyan is further informed and believes, and on the basis therefor alleges, that, prior to making a decision to seek renewal of the Hazardous Waste Management Facility Permit for OB/OD operations at Andersen AFB and submitting their application to the Guam EPA on May 17, 2021, Defendants did not prepare an EA or EIS that (1) takes the requisite "hard look" at the environmental impacts of the proposed OB/OD operations, (2) considers a reasonable range of alternatives, including the "no action" alternative, and (3)

provides opportunities for public comment on the proposed operations and reasonable alternatives.

## CLAIM FOR RELIEF

(VIOLATIONS OF NATIONAL ENVIRONMENTAL POLICY ACT AND ADMINISTRATIVE PROCEDURE ACT– FAILURE TO PREPARE AN ENVIRONMENTAL ASSESSMENT OR ENVIRONMENTAL IMPACT STATEMENT)

58.     Plaintiff Prutehi Litekyan realleges and incorporates herein by reference each and every allegation contained in all preceding paragraphs of this Complaint.

59.     Defendants Department of Defense and Department of the Air Force are "agencies of the Federal Government" and, therefore, must comply with NEPA. 42 U.S.C. § 4332(2).

60.     Defendants' decision to submit an application on May 17, 2021, seeking a three-year renewal of the Hazardous Waste Management Facility Permit to conduct OB/OD operations at Andersen AFB constitutes "major Federal action" for purposes of NEPA because it is an "activity or decision subject to Federal control and responsibility," including "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies." 40 C.F.R. § 1508.1(q)(2).

61.     Plaintiff Prutehi Litekyan is informed and believes, and on the basis therefor alleges, that, prior to making a decision to seek renewal of the Hazardous Waste Management Facility Permit for OB/OD operations at Andersen AFB and submitting their application to the Guam EPA on May 17, 2021, Defendants failed to prepare an EA or EIS that (1) takes the requisite "hard look" at the environmental impacts of the proposed OB/OD operations, (2) considers a reasonable range of alternatives, including the "no action" alternative, and (3)

provides opportunities for public comment on the proposed operations and reasonable alternatives.

62.     Defendants' decision to submit the May 21, 2021 application for renewal of the Hazardous Waste Management Facility Permit for OB/OD operations at Andersen AFB without first preparing a legally adequate EA or EIS violates NEPA and the CEQ and Air Force regulations implementing NEPA.

63.     Defendants' decision to submit the May 21, 2021 application for renewal of the Hazardous Waste Management Facility Permit for OB/OD operations at Andersen AFB without first preparing a legally adequate EA or EIS was arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Prutehi Litekyan respectfully requests that the Court:

64.     Enter a declaratory judgment that Defendants have violated and are violating NEPA, the CEQ and Air Force regulations implementing NEPA, and the APA by making a decision to seek renewal of the Hazardous Waste Management Facility Permit for OB/OD operations at Andersen AFB without first preparing an EA or EIS that (1) takes the requisite "hard look" at the environmental impacts of the proposed OB/OD operations, (2) considers a reasonable range of alternatives, including the "no action" alternative, and (3) provides opportunities for public comment on the proposed operations and reasonable alternatives.

65.     Grant preliminary and permanent injunctive relief to ensure that Defendants fully comply with NEPA, its implementing regulations, and the APA and to avoid irreparable harm to Plaintiff and Guam's environment until such compliance occurs, including, but not limited to:

a. Compelling Defendants promptly to withdraw their pending application for a Hazardous Waste Management Facility Permit for OB/OD operations at Andersen AFB; and

b. Enjoining Defendants from (i) resubmitting a permit application to the Guam EPA and/or (ii) carrying out any OB/OD activities at Andersen AFB for the duration of Defendants' noncompliance.

66. Retain continuing jurisdiction to review Defendants' compliance with all judgments and orders entered herein.

67. Award Plaintiff's costs of litigation, including reasonable attorneys' fees; and

68. Grant such other and further relief as the Court may deem just and proper to effectuate a complete resolution of the legal disputes between Plaintiff and Defendants.

Dated this 25th day of January, 2022.

Respectfully submitted,

_____
DAVID L. HENKIN (HSBA #6876)
[*Pro Hac Vice* Admission Forthcoming]
THIEN T. CHAU (CSBA #330315)
[*Pro Hac Vice* Admission Forthcoming]
EARTHJUSTICE

*Attorneys for Plaintiff Prutehi Litekyan: Save Ritidian*

/s/ Rachel M. Taimanao-Ayuyu
_____
RACHEL M. TAIMANAO-AYUYU (GBA #07097)
THE LAW OFFICE OF RACHEL TAIMANAO-AYUYU

*Local Counsel for Plaintiff Prutehi Litekyan: Save Ritidian*

22