DAVID L. HENKIN (HSBA #6876) (*Pro Hac Vice*)
EARTHJUSTICE
850 Richards St., Suite 400
Honolulu, HI 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org

THIEN T. CHAU (CSBA #330315) (*Pro Hac Vice*)
EARTHJUSTICE
1001 G St., NW, Suite 1000
Washington, D.C. 20001
T: (202) 745-5226
Email: tchau@earthjustice.org

Rachel M. Taimanao-Ayuyu (GBA #07097)
THE LAW OFFICE OF RACHEL TAIMANAO-AYUYU
130 Aspinall Ave., Ste. 2D
Hagåtña, GU, USA 96910
T: (671) 989-0559
Email: rachel@guamcounsel.com

Attorneys for Plaintiff

IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| PRUTEHI LITEKYAN: SAVE RITIDIAN, | ) | CIVIL NO. 1:22-cv-00001 |
| | ) | |
| Plaintiff, | ) | PLAINTIFF'S OPPOSITION TO |
| | ) | DEFENDANTS' MOTION TO DISMISS; |
| vs. | ) | DECLARATION OF DAVID L. HENKIN; |
| | ) | EXHIBITS 1-7 |
| UNITED STATES DEPARTMENT OF THE | ) | |
| AIR FORCE; FRANK KENDALL, Secretary | ) | |
| of the Air Force; UNITED STATES | ) | |
| DEPARTMENT OF DEFENSE; and LLOYD | ) | |
| AUSTIN, Secretary of Defense, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

<u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..................................................................................................... 1

II.     LEGAL FRAMEWORK: THE NATIONAL ENVIRONMENTAL POLICY ACT ........ 2

III.    FACTUAL BACKGROUND ............................................................................................ 4

IV.     THE AIR FORCE'S DECISION TO USE OB/OD IS NOT EXEMPT FROM
        NEPA ....................................................................................................................... 6

V.      THIS COURT CANNOT RESOLVE THE MERITS OF PLAINTIFF'S CLAIMS
        WITHOUT FIRST REVIEWING THE WHOLE ADMINISTRATIVE RECORD ........ 13

VI.     THIS LAWSUIT CHALLENGES FINAL AGENCY ACTION ..................................... 14

VII.    PRUTEHI LITEKYAN HAS STANDING ...................................................................... 19

VIII.   PLAINTIFF'S CHALLENGE TO DEFENDANTS' NEPA VIOLATIONS IS
        RIPE ........................................................................................................................ 22

IX.     THIS LAWSUIT CHALLENGES MAJOR FEDERAL ACTION ................................. 24

X.      CONCLUSION .......................................................................................................... 25

Case 1:22-cv-00001     Document 20     Filed 05/02/22     Page 2 of 33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alabama ex rel. Siegelman v. Envtl. Prot. Agency*,
    911 F.2d 499 (11th Cir. 1990) ...........................................................................7

*Anchorage v. United States*,
    980 F.2d 1320 (9th Cir. 1992) .........................................................................7

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979)................................................................................1, 25

*Bennett v. Spear*,
    520 U.S. 154 (1997).................................................................11, 16, 18, 19

*Chem. Weapons Working Grp., Inc. v. Dep't of Army*,
    111 F.3d 1485 (10th Cir. 1997) ....................................................................8, 9

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    341 F.3d 961 (9th Cir. 2003) .............................................................2, 16, 22, 23

*Citizens for Clean Energy v. U.S. Dep't of the Interior*,
    384 F. Supp. 3d 1264 (D. Mont. 2019).........................................................18, 19

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) .....................................................................2, 24

*Conservation Council for Hawai'i v. Nat'l Marine Fisheries Serv.*,
    97 F. Supp. 3d 1210 (D. Haw. 2015).......................................................10, 11, 12

*County of Maui v. Hawaii Wildlife Fund*,
    140 S. Ct. 1462 (2020)...................................................................................17

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020)...................................................................................14

*Envtl. Def. Fund, Inc. v. Envtl. Prot. Agency*,
    489 F.2d 1247 (D.C. Cir. 1973)........................................................................7

*Foman v. Davis*,
    371 U.S. 178 (1962)......................................................................................19

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)................................................................................15, 16

Case 1:22-cv-00001    Document 20    Filed 05/02/22    Page 3 of 33

**CASES (continued)**

*Hall v. Norton,*
   266 F.3d 969 (9th Cir. 2001) ............................................................22

*Her Majesty the Queen in Right of Ontario v. U.S. Envtl. Prot. Agency,*
   912 F.2d 1525 (D.C. Cir. 1990) .........................................................18

*ʻĪlioʻulaokalani Coalition v. Rumsfeld,*
   464 F.3d 1083 (9th Cir. 2006) ...........................................................12

*Indust. Customers of NW. Utils. v. Bonneville Power Admin.,*
   408 F.3d 638 (9th Cir. 2005) .............................................................19

*LaFlamme v. Fedʼl Energy Regul. Commʼn,*
   852 F.2d 389 (9th Cir. 1988) ...............................................10, 15, 17

*Lands Council v. Powell,*
   395 F.3d 1019 (9th Cir. 2004) ..................................................... *passim*

*Levine v. Vilsack,*
   587 F.3d 986 (9th Cir. 2009) .............................................................20

*Metcalf v. Daley,*
   214 F.3d 1135 (9th Cir. 2000) .....................................................12, 25

*Ohio Forestry Assʼn v. Sierra Club,*
   523 U.S. 726 (1998)....................................................................22, 23

*Oregon Natural Desert Assʼn v. U.S. Forest Serv.,*
   465 F.3d 977 (9th Cir. 2006) .............................................................15

*Portland Audubon Soc. v. Endangered Species Comm.,*
   984 F.2d 1534 (9th Cir. 1993) ...........................................................14

*Portland Cement Assʼn v. Ruckelshaus,*
   486 F.2d 375 (D.C. Cir. 1973) .............................................................7

*Rattlesnake Coal. v. U.S. Envtl. Prot. Agency,*
   509 F.3d 1095 (9th Cir. 2007) ...........................................................18

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989)................................................................2, 10, 17

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
   747 F.3d 581 (9th Cir. 2014) ...........................................................7, 8

Case 1:22-cv-00001   Document 20   Filed 05/02/22   Page 4 of 33

**CASES (continued)**

*Sierra Club v. Fed. Energy Regul. Comm'n*,
754 F.2d 1506 (9th Cir. 1985) ...................................................................8, 9

*Sierra Club v. U.S. Army Corps of Engineers*,
446 F.3d 808 (8th Cir. 2006) ...........................................................17, 22, 25

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)............................................................................20, 21

*State of Cal. v. Block*,
690 F.2d 753 (9th Cir. 1982) ...........................................................3, 13, 16

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
5 F.4th 997 (9th Cir. 2021) ...........................................................20, 21, 22

*Wyoming v. Hathaway*,
525 F.2d 66 (10th Cir. 1975) .......................................................................7

**UNITED STATES CODE**

5 U.S.C. § 551(13) ........................................................................................18

5 U.S.C. § 706 ..............................................................................................13

5 U.S.C. § 706(2)(A)......................................................................................14

42 U.S.C. § 4332...........................................................................................10

42 U.S.C. § 4332(2) ......................................................................................17

42 U.S.C. § 4332(2)(C)...................................................................3, 8, 24, 25

42 U.S.C. § 4332(2)(C)(ii)............................................................................25

**CODE OF FEDERAL REGULATIONS**

32 C.F.R. pt. 989, app. B ...............................................................................4

32 C.F.R. § 989.3(d)(2)..................................................................................14

32 C.F.R. § 989.3(e)(4)..................................................................................14

32 C.F.R. § 989.12 ........................................................................................14

iv

**CODE OF FEDERAL REGULATIONS (continued)**

40 C.F.R. § 266.202(a)(1)(i) ..................................................................14

40 C.F.R. pt. 270 ..................................................................................4

40 C.F.R. § 270.1(c) ............................................................................19

40 C.F.R. § 270.30(b) .....................................................................4, 19

40 C.F.R. § 270.51(d) ...................................................................*passim*

40 C.F.R. § 1501.2(a) .........................................................................12

40 C.F.R. § 1501.3(a)(3) .......................................................................3

40 C.F.R. § 1501.4(a) ...........................................................................4

40 C.F.R. § 1501.4(b) ...........................................................................4

40 C.F.R. § 1501.5(a) ...........................................................................3

40 C.F.R. § 1501.5(c)(2) .......................................................................3

40 C.F.R. § 1501.5(d) ...........................................................................8

40 C.F.R. § 1501.6(a) ...........................................................................3

40 C.F.R. § 1501.7(a) .........................................................................10

40 C.F.R. § 1501.7(a)(1) .....................................................................10

40 C.F.R. § 1501.7(c)(2) .....................................................................10

40 C.F.R. § 1501.8(a) .........................................................................10

40 C.F.R. § 1501.8(b)(8) .....................................................................10

40 C.F.R. § 1501.11 ............................................................................10

40 C.F.R. § 1501.12 ............................................................................10

40 C.F.R. § 1502.1 ................................................................................3

40 C.F.R. § 1502.2(g) .........................................................................12

40 C.F.R. § 1502.5 ..........................................................................7, 13

**CODE OF FEDERAL REGULATIONS (continued)**

40 C.F.R. § 1502.5(a)...................................................................................................7, 13, 21

40 C.F.R. § 1502.5(b) ........................................................................................................7, 8

40 C.F.R. § 1502.14 ...............................................................................................................3

40 C.F.R. § 1506.3 ...............................................................................................................10

40 C.F.R. § 1506.6(b) ............................................................................................................3

40 C.F.R. § 1508.1(m) ...........................................................................................................3

40 C.F.R. § 1508.1(q) ..........................................................................................................24

40 C.F.R. § 1508.1(q)(1)(iii)................................................................................................24

40 C.F.R. § 1508.1(q)(2)...............................................................................................3, 9, 24

**FEDERAL REGISTER**

85 Fed. Reg. 43,304 (July 16, 2020).....................................................................................13

**LEGISLATIVE HISTORY**

S. Rep. No. 91-296 (1969)....................................................................................................25

**GUAM REGULATIONS**

22 Guam Admin. R. & Regs. § 30109(a) ..............................................................................4, 8

I.     INTRODUCTION

This Court should reject Defendants' attempt to insulate from judicial review the U.S. Air Force's failure to comply with the National Environmental Policy Act ("NEPA") before it made its decision to use open burning and open detonation ("OB/OD") to dispose of hazardous waste explosives at Andersen Air Force Base's Explosive Ordnance Disposal ("EOD") Range. Plaintiff Prutehi Litekyan contends that the Air Force made this decision without first taking the NEPA-mandated "hard look" at "environmental impacts and alternatives so as to permit informed decision making." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2004).

For NEPA, timing is everything. Federal agencies must "integrate the NEPA process with other planning ***at the earliest possible time*** to insure that planning and decisions reflect environmental values." *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979) (emphasis added; citation omitted). By the time the Air Force submitted its application to the Guam Environmental Protection Agency ("Guam EPA") for a new Resource Conservation and Recovery Act ("RCRA") permit, the Air Force had already made up its mind about where (the EOD Range) and how (OB/OD) it would dispose of hazardous waste explosives. It was too late for "environmental concerns [to be] interwoven into the fabric of agency planning," as NEPA mandates. *Id.* Any analysis Guam EPA may later perform in considering the RCRA permit application has no bearing on whether the Air Force violated NEPA. *See* Part IV, *infra*.

Defendants' claim they have already complied with NEPA is premature. Without the whole administrative record, the Court cannot resolve Plaintiff's claims. *See* Part V, *infra*.

This Court does not lack jurisdiction just because the RCRA permit renewal is still pending. The Air Force's decision to continue OB/OD at the EOD Range has already inflicted both procedural harm—the agency made up its mind "without having before [it] an analysis (with public comment) of the likely effects of [its] decision on the environment"—and on-the-

ground harm, with the Air Force invoking its permit renewal application to justify continued

activities at the EOD Range after its prior permit expired. *Citizens for Better Forestry v. U.S.*

*Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003) (citation omitted). The Air Force's decision to

conduct OB/OD, without NEPA compliance, therefore constitutes "final agency action," Prutehi

Litekyan has standing, and this NEPA challenge is ripe. *See* Parts VI-VIII, *infra*.

Finally, because the Air Force's decision is a final agency action and its permit renewal

application has already resulted in "irretrievable commitment of resources" through continued,

destructive OB/OD activities, the Air Force's decision is a "major federal action" subject to

NEPA. *Conner v. Burford*, 848 F.2d 1441, 1448 (9th Cir. 1988); *see* Part IX *infra*.

## II.     LEGAL FRAMEWORK: THE NATIONAL ENVIRONMENTAL POLICY ACT

NEPA "declares a broad national commitment to protecting and promoting

environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

Congress passed NEPA "to protect the environment by requiring that federal agencies"—

including the Air Force—"carefully weigh environmental considerations and consider potential

alternatives to the proposed action ***before*** the government launches any major federal action."

*Lands Council*, 395 F.3d at 1026 (emphasis added). "Simply by focusing the agency's attention

on the environmental consequences of a proposed project, NEPA ensures that important effects

will not be overlooked or underestimated only to be discovered after resources have been

committed or the die otherwise cast." *Robertson*, 490 U.S. at 349.

NEPA achieves its policy goals "through a set of 'action-forcing' procedures that require

that agencies take a '"hard look" at environmental consequences' . . . and that provide for broad

dissemination of relevant environmental information." *Id.* at 350 (citation omitted). NEPA

requires federal agencies to prepare an environmental impact statement ("EIS") for all "major

federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "*Major Federal action* … means an activity or decision subject to Federal control and responsibility" and "may include new and continuing activities, including projects and programs entirely or partly … conducted, regulated, or approved by Federal agencies." 40 C.F.R. § 1508.1(q)(2). The term "*[h]uman environment* means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." *Id.* § 1508.1(m).

When an agency does not know whether the effects of its action will be "significant," it may prepare an environmental assessment ("EA") to help make that determination. *Id.* § 1501.5(a). "[I]f the agency determines, based on the [EA], not to prepare an [EIS] because the proposed action will not have significant effects," then the agency must prepare a "finding of no significant impact" ("FONSI"). *Id.* § 1501.6(a). If the EA indicates that the federal action "[i]s likely to have significant effects," the agency must prepare an EIS. *Id.* § 1501.3(a)(3).

Whether an agency prepares an EIS or EA, it must take a "hard look" at its proposed action's environmental impacts and examine "alternatives that might be pursued with less environmental harm." *Lands Council*, 395 F.3d at 1027; *see* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.5(c)(2), 1502.1, 1502.14. NEPA also requires "public participation in the evaluation of the environmental consequences of a major federal action." *State of Cal. v. Block*, 690 F.2d 753, 771 (9th Cir. 1982); *see* 40 C.F.R. § 1506.6(b). "This reflects the paramount Congressional desire to internalize opposing viewpoints into the decision-making process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision." *Id.*

Agencies must identify in their NEPA regulations "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation

of an [EA] or [EIS]." 40 C.F.R. § 1501.4(a). To invoke a categorical exclusion, the agency must make an express determination that "a categorical exclusion identified in its agency NEPA procedures covers [the] proposed action." *Id.* § 1501.4(b). Moreover, prior to relying on a categorical exclusion, the agency must "evaluate the action for extraordinary circumstances in which the normally excluded action may have a significant effect" and thus require an EA or EIS. *Id.*; *see also* 32 C.F.R. pt. 989, app. B at A2.2.

III.    FACTUAL BACKGROUND

On May 17, 2021, the Air Force submitted an application to Guam EPA to renew its Hazardous Waste Management Facility Permit ("RCRA permit") to dispose of hazardous waste explosives through OB/OD at the EOD Range, which is located on Andersen Air Force Base at the eastern edge of Tarague Beach. ECF 1 ¶¶ 2, 40; *see generally* Ex. 1; *id.* at 1-151, 1-220, 1-289. The Air Force first received a RCRA Permit for OB/OD in 1982 and has renewed its permit every three years since. ECF 1 ¶ 45. The Air Force's OB/OD operations have consisted of blowing up hazardous waste explosives directly on the bare sand and burning them in the open air. ECF 1 ¶¶ 40-41. Although the Air Force has conducted open detonation under each renewed permit, open burning operations have been inactive since at least before May 2002. *Id.*

The Air Force's most recent RCRA Permit, which was issued in 2018 ("2018 Permit") expired on September 3, 2021. *Id.* ¶ 40; Ex. 2 at 2-002 to -003. Prior to the 2018 Permit's expiration, the Air Force needed to decide whether to continue OB/OD operations on Tarague Beach (and, if so, apply for permit renewal) or to pursue another method and/or location for managing hazardous waste explosives. *See* 40 C.F.R. § 270.30(b); 22 Guam Admin. R. & Regs. § 30109(a) (generally adopting 40 C.F.R. pt. 270); Ex. 2 at 2-022 (¶ I.E.2). The Air Force's

4

permit renewal application memorialized the agency's decision to dispose of hazardous waste explosives through OB/OD at the EOD Range for another three years. ECF 1 ¶ 2.

The Air Force's permit renewal application detailed where OB/OD would take place (including maps and photos), the design of the OB/OD units, and the procedures for OB/OD operations. *Id.* ¶¶ 40-44; *see, e.g.,* Ex. 1 at 1-215 to -222, 1-225, 1-232. The Air Force specified the volume of waste to be disposed annually—30,000 pounds through open detonation and 5,000 pounds through open burning, ECF 1 ¶ 40—as well as the types of waste—including "common military ordnance material (such as black powder, white/red phosphorus, tear gas, ammunitions, propellants, and explosive materials)," bombs, mortars, antipersonnel and antitank mines, and grenades. *Id.* ¶ 43 (quoting Ex. 1 at 1-033 (¶ III.B.1)); *see also* Ex. 1 at 1-109 to -111.

The location the Air Force has chosen to blow up and burn hazardous waste explosives lies on ancestral lands, seized from local families, and is surrounded by environmentally and culturally significant sites. ECF 1 ¶¶ 3-5. The EOD Range is on Tarague Beach, less than 100 feet from the jungle on three sides and less than 200 feet from the ocean to the north. ECF 1 ¶¶ 40, 42. Families recreate on Tarague Beach to the west of the range, fish just offshore to put food on their tables, and collect traditional medicine nearby. *Id.* ¶¶ 4, 49. The beach is nesting habitat for the endangered green sea turtle, and migratory seabirds frequent the range. *Id.* ¶¶ 4, 52. Beneath the sand where proposed OB/OD would occur lies Guam's shallow, unconfined aquifer, which supplies more than 80 percent of Guam's population with drinking water. *Id.* ¶¶ 4, 49.

The Air Force's proposed OB/OD operations threaten serious harm to local families and the environment. *Id.* ¶¶ 46-52. OB/OD releases contaminants directly into the air, with no way to minimize releases, and fuel used during open burning can spill directly onto the beach. *Id.* ¶¶ 47-48. Hazardous waste constituents released during OB/OD can reach the shallow aquifer

underneath the EOD Range and contaminate Guam's drinking water supply. *Id.* ¶ 49. Unexploded ordnance and fragments can be ejected into the adjacent ocean and reef, threatening local families that recreate at Tarague Beach and fish for food offshore. *Id.* Endangered green sea turtles nest on Tarague beach adjacent to the EOD Range, and explosions from OB/OD operations subject the turtles' nests and the eggs they contain to ground shocks. *Id.* ¶ 52. The blasts also can kill or injure migratory seabirds that forage and rest within the EOD Range. *Id.* OB/OD operations can leave the land permanently littered with buried, unexploded ordnance and hazardous chemicals. *Id.* ¶ 51. Such long-term hazardous contamination could remain far beyond the life of the OB/OD facility and permanently change these ancestral lands, jeopardizing their return to the indigenous families from whom they were seized. *See id.* ¶¶ 5, 51.

Despite these potentially significant environmental impacts, the Air Force made its final decision to dispose of hazardous waste explosives through OB/OD at the EOD Range and submitted its permit renewal application without conducting any NEPA analysis. *Id.* ¶¶ 56-57.

Since submitting its permit renewal application, the Air Force has continued to conduct OB/OD at the EOD Range under the terms of the now expired 2018 Permit. Ex. 3; *see also* Ex. 4; 40 C.F.R. § 270.51(d). The 2018 Permit authorizes precisely the same OB/OD activities, treating the same quantities of hazardous waste explosives, that the Air Force requests in its renewal application. *Compare* Ex. 1 at 1-009, 1-032 to -034 *with* Ex. 2 at 2-012, 2-035 to -037.

IV.    THE AIR FORCE'S DECISION TO USE OB/OD IS NOT EXEMPT FROM NEPA

Defendants' claim that RCRA permitting is exempt from NEPA is a legal *non sequitur*. ECF 19 at 8-12. This lawsuit challenges the Air Force's failure to comply with NEPA before making the decision to use OB/OD to dispose of munitions on Tarague Beach at the EOD Range. ECF 1, ¶¶ 1, 56-65. It does not challenge any permitting decision under RCRA. This Court need

not, therefore, address the question of first impression in the Ninth Circuit whether a RCRA permitting agency must comply with NEPA when deciding whether to issue a RCRA permit.[1]

Defendants' argument that environmental review of the Air Force's decision to dispose of munitions using OB/OD on Tarague Beach can be deferred until the RCRA permitting process conflates two different types of agency decision-making that have two distinct timing triggers under NEPA: (1) decisions by federal agencies to "directly undertake[]" actions with the potential to harm the human environment, on the one hand, and (2) decisions by federal permitting agencies regarding an application to conduct those activities, on the other. 40 C.F.R. § 1502.5(a); *see id.* § 1502.5(b). Here, because the Air Force will "directly undertake[]" OB/OD operations, NEPA specifies that the Air Force was obliged to prepare its NEPA analysis "at the feasibility analysis (go/no-go) stage," *i.e.*, before the Air Force decided how and where to dispose of its hazardous waste explosives. *Id.* § 1502.5(a); *see also id.* § 1502.5 (analysis must be

---

[1] If this Court decides to address this question, it should reject Defendants' arguments based on the "functional equivalence" doctrine, which the Ninth Circuit has not adopted. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 651 n.51 (9th Cir. 2014) ("We have been skeptical of the 'functional equivalent' approach and have not used this language in our cases."). The Ninth Circuit's rare decisions exempting environmental agency decisions from NEPA were "'displacement' cases rather than 'functional equivalent' cases." *Id.*; *see, e.g.*, *Anchorage v. United States*, 980 F.2d 1320, 1327 (9th Cir. 1992) ("Congress carved out an exemption to NEPA for actions taken by the Administrator of the [U.S.] EPA pursuant to the [Clean Water Act].").

Even those jurisdictions that have adopted the "functional equivalence" doctrine emphasize that it is "a narrow exemption from [NEPA's] literal requirements" that applies to only a subset of "environmentally protective regulatory actions" taken by federal "environmental agencies" like the U.S. EPA. *Envtl. Def. Fund, Inc. v. Envtl. Prot. Agency*, 489 F.2d 1247, 1257 (D.C. Cir. 1973); *see, e.g.*, *Alabama ex rel. Siegelman v. Envtl. Prot. Agency*, 911 F.2d 499, 504-05 (11th Cir. 1990); *Wyoming v. Hathaway*, 525 F.2d 66, 71-72 (10th Cir. 1975). "NEPA must be accorded full vitality as to non-environmental agencies" like the Air Force, to which the doctrine does not apply. *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 387 (D.C. Cir. 1973).

Finally, to Plaintiffs' knowledge, no court has ever applied the "functional equivalence" doctrine to regulatory actions taken by a nonfederal permitting agency like Guam EPA, as Defendants urge here. ECF 19 at 10-12.

"prepared early enough so that it can serve as an important practical contribution to the decision-making process"). Different timing for NEPA compliance would apply to any federal permitting agency from which the Air Force might seek a permit to authorize the hazardous waste disposal activities the Air Force has decided to carry out. A federal permitting agency must start its NEPA analysis "as soon as practicable after receiving the application." *Id.* §§ 1501.5(d), 1502.5(b).[2]

Timely compliance with NEPA is particularly critical here, where the Air Force is not waiting for Guam EPA to issue a new permit before proceeding with OB/OD on Tarague Beach. Under RCRA regulations that Guam has adopted, submission of "a timely and complete application" for permit renewal extends "the terms and conditions" of the prior permit "beyond [its] expiration date," until Guam EPA issues or denies a new RCRA permit. 40 C.F.R. § 270.51(d), *see* 22 Guam Admin. R. & Regs. § 30109(a); Ex. 4. The Air Force has invoked that provision to continue OB/OD at the EOD Range beyond the expiration of the 2018 permit. Ex. 3. There is simply no basis for Defendants' claim that they "cannot on their own alter the status quo because without the permit, they cannot operate the Facility." ECF 19 at 12. The Air Force claims a legal right to change the status quo simply by submitting its application, without which OB/OD would have had to cease on September 3, 2021, when the 2018 Permit expired.

No legal authority supports Defendants' argument that, where environmental review will occur for a subsequent permitting decision, the federal agency that will directly carry out an environmentally harmful activity is exempt from NEPA.[3] The sole case Defendants cite—*Sierra*

---

[2] Guam EPA's permitting decision is not a "Federal action[]" subject to NEPA. 42 U.S.C. § 4332(2)(C); *cf. Jewell*, 747 F.3d at 644 ("no downstream federal agency to complete an EIS").

[3] Notably, in *Chem. Weapons Working Grp., Inc. v. Dep't of Army*, 111 F.3d 1485 (10th Cir. 1997), the Army prepared two EISs—one programmatic and one site-specific—to inform its decision of how best to dispose of chemical weapons. *Id.* at 1487. The fact that the Army

8

*Club v. Fed. Energy Regul. Comm'n*, 754 F.2d 1506 (9ᵗʰ Cir. 1985)—is inapposite. That case involved a challenge to the Federal Energy Regulatory Commission's ("FERC's") issuance of a preliminary permit to nonfederal applicants—the Modesto and Turlock Irrigation Districts and the City and County of San Francisco—for a hydroelectric project. *Id.* at 1508. The preliminary permit's "sole purpose" was "to maintain the applicant's priority of application for a license." *Id.* at 1509. The applicants could not proceed with their project until they "obtain[ed] Forest Service and [Bureau of Land Management] special use permits," and those "other federal agencies" would "be responsible for evaluating the environmental impact of activities authorized by their … permits." *Id.* There was no claim in that case that the nonfederal project proponents had any NEPA duties. The Ninth Circuit therefore had no occasion to address the situation presented here, where the Air Force—the action agency—failed to comply with NEPA before making its decision to proceed with an environmentally destructive project that requires a permit.[4]

NEPA, however, directly addresses—and refutes—Defendants' claims that "[r]equiring multiple agencies to conduct an environmental review of the same action is inefficient" and that a federal action agency is exempt from NEPA whenever a permitting agency will later perform some type of review. ECF 19 at 12. NEPA's broad definition of "Major Federal action" that triggers environmental review includes "projects and programs entirely or partly … ***conducted***, ***regulated***, or ***approved*** by Federal agencies." 40 C.F.R. § 1508.1(q)(2) (emphasis added). The statute's implementing regulations expressly contemplate multiple federal agencies conducting environmental review of the same action, such as where "more than one Federal agency …

---

required both RCRA and Clean Air Act permits to conduct its disposal activities did not relieve the Army of its duty to comply with NEPA. *Id.* at 1488.

⁴ *Sierra Club* certainly did not address situations where a nonfederal agency like Guam EPA, rather than "other federal agencies" with NEPA duties, will issue the permit. *Id.*

[p]roposes or is involved in the same action." *Id.* § 1501.7(a)(1); *see also id.* § 1501.8(a) (if asked, "any Federal agency with jurisdiction by law shall be a cooperating agency"). Far from promoting inefficiency, NEPA mandates that ***both*** the federal agency proposing to undertake an action directly—here, the Air Force—***and*** any federal permitting agency with "[p]roject approval or disapproval authority," *id.* § 1501.7(c)(2), must comply with NEPA to ensure that each agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson*, 490 U.S. at 349; *cf. LaFlamme v. Fed'l Energy Regul. Comm'n,* 852 F.2d 389, 398 (9ᵗʰ Cir. 1988) ("This circuit has interpreted the congressional mandate, to apply NEPA 'to the fullest extent possible,' 42 U.S.C. § 4332, as a direction to 'make as liberal an interpretation as we can to accommodate the application of NEPA.'") (citation omitted).

  *Conservation Council for Hawai'i v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210 (D. Haw. 2015) ("*CCH*")—which, like this case, involved military activities—shows how NEPA works in such a situation. In *CCH*, the Navy required a Marine Mammal Protection Act ("MMPA") permit from the National Marine Fisheries Service ("NMFS") for training and testing activities that would harm ("take") marine mammals. *Id.* at 1214-15. The court evaluated separately whether the Navy—the action agency—and NMFS—the permitting agency—violated their respective, and distinct, duties under NEPA.[5] The court held that the Navy, which was tasked with deciding "what training or testing activities [it] should engage in," *CCH*, 97 F. Supp.

---

  [5] The Navy was the lead agency preparing the EIS, and NMFS, as a cooperating agency, adopted it. *Id.* at 1215; *see* 40 C.F.R. §§ 1501.7(a), 1501.8(b)(8), 1506.3. Adoption is one of several mechanisms NEPA provides to address Defendants' policy concerns about inefficiency when NEPA requires multiple agencies to review the same or similar actions. *See* 40 C.F.R. §§ 1501.11 (tiering); 1501.12 (incorporation by reference).

10

3d at 1236, failed to take "the 'hard look' required by NEPA" at alternatives that might reduce environmental impacts. *Id.* at 1238. The court further held that NMFS—whose "job was to determine whether to authorize the takes requested by the Navy"—had violated its NEPA duty to "consider what would be a true 'no action' alternative from NMFS's perspective," denial of "the Navy's request for an incidental take authorization." *Id.* at 1236.

*CCH* vividly illustrates why NEPA does not exempt the agency that proposes harmful action even if a permitting agency will also perform environmental review. Doing so would subvert Congress's intent to foster "informed decision making" by requiring "each federal agency spearheading a major federal project" to take a "hard look" at "relevant environmental considerations" and to consider "any choices or alternatives that might be pursued with less environmental harm." *Lands Council*, 395 F.3d at 1027. In *CCH*, NMFS's job as the permitting agency "was to determine whether to authorize the takes requested by the Navy." 97 F. Supp. 3d at 1236. In contrast, the Navy's task was "to determine what training or testing activities [it] should engage in," a much more open-ended inquiry, with the Navy's ultimate decision driving the level of marine mammal take for which it needed NMFS's authorization. *Id.*

Likewise, here, by the time the Air Force submitted its application to Guam EPA, it had already made up its mind about "what [hazardous waste disposal] activities [it] should engage in," selecting both the disposal technology and the location of disposal activities. *Id.*[6] The application specifies that the Air Force will "open burn/open detonate … hazardous wastes … that consist of common military ordnance material" at the EOD Range on Tarague Beach. Ex. 1

---

[6] Defendants do not dispute that the Air Force's decision to conduct OB/OD operations at the EOD Range marked "the 'consummation' of the agency's decisionmaking process." ECF 19 at 14 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

11

at 1-033 (¶ III.B.1). The Air Force made this decision without first complying with NEPA's mandate "to put on the table, for the deciding agency's and for the public's view, a sufficiently detailed statement of environmental impacts and alternatives so as to permit informed decision making." *Lands Council*, 395 F.3d at 1027. Among other things, before making its decision, the Air Force failed to analyze "alternatives that might be pursued with less environmental harm," including alternate technologies for munitions disposal and alternate locations to dispose of munitions (including locations outside of Guam). *Id.*; *cf. ʻĪlioʻulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1098, 1101-02 (9th Cir. 2006) (Army violated NEPA by failing to consider locations outside Hawaiʻi to station armored brigade). The Air Force thus violated NEPA's command to conduct the mandated review of the impacts of conducting OB/OD on Tarague Beach "at the earliest reasonable time to ensure that [it] consider[s] environmental impacts in [its] planning and decisions." 40 C.F.R. § 1501.2(a); *see id.* § 1502.2(g); *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (NEPA analysis "must be 'prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made'") (citation omitted). This duty is independent of, and precedes, the Guam EPA's determination whether the application complies with RCRA.

Even if Guam EPA's permitting decision under its delegated RCRA authority were a federal action subject to NEPA (and it is not), its far more limited review of the RCRA application would not excuse the Air Force from conducting the broad NEPA-mandated vetting of impacts and alternatives before making the decision how and where to dispose of munitions. Guam EPA's "job [is] to determine whether to authorize the [OB/OD operations] requested by the [Air Force]" pursuant to RCRA. *CCH*, 97 F. Supp. 3d at 1236. In contrast, **before** deciding to pursue a RCRA-regulated activity, the Air Force was obliged to "carefully weigh environmental

considerations and consider potential alternatives to the proposed action," as well as "permit informed public comment." *Lands Council*, 395 F.3d at 1026-27;[7] *see* 40 C.F.R. § 1502.5 (agency should start preparing NEPA analysis "as close as practicable to the time the agency *is developing* … [its] proposal") (emphasis added); 85 Fed. Reg. 43,304, 43,321 (July 16, 2020) (timing must ensure that "the NEPA analysis meaningfully informs the agency's decision").

This lawsuit properly challenges the failure of the Air Force—as the federal agency that will "directly undertake[] destructive munitions disposal—to comply with NEPA, independent of Guam EPA's review of the RCRA permit application. 40 C.F.R. § 1502.5(a). Requiring the Air Force's timely compliance with NEPA is particularly important here given that the RCRA regulations allow destructive OB/OD activities to continue beyond the 2018 Permit's expiration—before the Guam EPA makes a decision—as long as the Air Force submits a "timely and complete" permit renewal application. 40 C.F.R. § 270.51(d).

## V.     THIS COURT CANNOT RESOLVE THE MERITS OF PLAINTIFF'S CLAIMS WITHOUT FIRST REVIEWING THE WHOLE ADMINISTRATIVE RECORD

As almost an aside, Defendants claim that an EIS the Navy prepared in 2015—the Mariana Islands Training and Testing ("MITT") EIS—satisfies NEPA for the Air Force's decision last year to use OB/OD to dispose of munitions at the EOD Range. ECF 19 at 13. This Court cannot, however, resolve the merits of Plaintiff's claims, which arise under the Administrative Procedure Act, without "review[ing] the whole record." 5 U.S.C. § 706. "The 'whole record' includes everything that was before the agency pertaining to the merits of its

---

[7] While Guam EPA invited public comment on the RCRA application, ECF 19 at 10 n.4, the opportunity for public comment came too late to influence the Air Force's already completed decision on how and where to dispose of hazardous waste explosives. *See Block*, 690 F.2d at 770 ("NEPA's public comment procedures are at the heart of the NEPA review process").

decision." *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020) (citation omitted).

Until this Court has reviewed the whole record, there is no way to assess whether the Air Force considered the MITT EIS in making the challenged decision or if Defendants' invocation of the EIS is "impermissible '*post hoc* rationalization.'" *Id.* at 1908 (citation omitted). The Air Force's regulations require the use of AF Form 813 to document whether NEPA analysis is required for proposed actions. 32 C.F.R. §§ 989.3(d)(2), 989.3(e)(4), 989.12; *see, e.g.*, Ex. 5. Assuming the Air Force gave NEPA any thought before making its decision to conduct OB/OD on Tarague Beach, the record should establish whether, in fact, the Air Force relied on the MITT EIS to satisfy its NEPA obligations. If it did, the Court would have to determine, based on the whole record, whether reliance on the MITT EIS was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).[8]

VI.    THIS LAWSUIT CHALLENGES FINAL AGENCY ACTION

Defendants' argument that this lawsuit fails to challenge final agency action under the Administrative Procedure Act ("APA"), depriving this Court of jurisdiction, is based on

---

[8] While it is premature to litigate the merits, Prutehi Litekyan disputes Defendants' claim the MITT EIS studied the OB/OD activities at issue here, which require a RCRA permit. Notably, the MITT EIS expressly states that *none* of the training involving munitions disposal that it evaluated requires a RCRA permit. Ex. 6: MITT EIS at 6-3; *see also* 40 C.F.R. § 266.202(a)(1)(i). Moreover, despite the fact that the EOD Range "has been in constant use since its inception at least 20 years ago," Ex. 1 at 1-32 (¶ III.A), the MITT EIS states that, under its "no action" alternative, zero training activities involving unexploded ordnance disposal would take place at any of the "Air Force Disposal Sites." Ex. 7: MITT EIS at 2-6. The MITT EIS—which focused on training, not routine disposal of hazardous waste explosives—obviously did not study the OB/OD activities that are the subject of this lawsuit.

14

Defendants' erroneous characterization of "the challenged agency action" as "the Application submitted to Guam EPA." ECF 19 at 14. As the complaint states, the challenged action is not the RCRA application itself, but rather Defendants' failure to comply with NEPA before deciding to "conduct[] open burning and open detonation … of hazardous waste munitions at the Explosive Ordnance Disposal Range … on Tarague Beach at Andersen Air Force Base." ECF 1 ¶ 1; *see also id.* ¶¶ 2-6, 60-65. Because Defendants did not prepare any NEPA document (categorical exclusion, EA/FONSI, or EIS), the complaint references the application to establish when the Air Force made its decision—uninformed by NEPA analysis—to conduct OB/OD on Tarague Beach. *See id.* ¶¶ 56-57, 60. By seeking a permit, the agency was taking affirmative steps to carry out that decision. The complaint does not, therefore, challenge the application itself, but rather Defendants' failure to act "in accordance with law, and/or without observance of procedure required by law," when they did not prepare any NEPA analysis before making their decision. *Id.* ¶ 63; *cf. LaFlamme*, 852 F.2d at 399 ("[w]e enforce NEPA under our authority to 'hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law.'") (citations omitted).

"To determine when an agency action is final, … [t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 796-97 (1992). This Court must "focus on the practical and legal effects of the agency action: '[T]he "finality element must be interpreted in a pragmatic and flexible manner."'" *Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citations omitted).

Here, the Air Force's RCRA application establishes "the 'consummation' of the agency's decisionmaking process," *i.e.*, the Air Force's decision to conduct OB/OD at the EOD Range

15

without NEPA analysis. *Bennett*, 520 U.S. at 178 (citation omitted). There is nothing in the RCRA application to suggest that the Air Force's decision to conduct OB/OD on Tarague Beach is "of a merely tentative or interlocutory nature" or that the Air Force intends later to conduct the requisite NEPA review before carrying out this destructive activity. *Id.* at 178. Rather, the application states conclusively that the Air Force "shall operate the OB/OD unit," notwithstanding the lack of NEPA analysis. Ex. 1 at 1-033 (¶ III.A). Moreover, the Air Force has, in fact, continued conducting OB/OD based on the application's submission. Ex. 3.

The Air Force's decision to conduct OB/OD without complying with NEPA is also "one that will directly affect the parties," *Franklin*, 505 U.S. at 796, or, in *Bennett*'s parlance, one "from which legal consequences will flow." 520 U.S. at 178. The Air Force's failure to comply with NEPA deprived the public, including Prutehi Litekyan, of "the opportunity to analyze [the OB/OD] proposal and submit comment" before the Air Force made a decision, "insulat[ing] its decision-making process from public scrutiny." *Block*, 690 F.2d at 771. The deprivation of the "opportunity to comment on" a NEPA analysis violated [Prutehi Litekyan's] rights under the regulations implementing NEPA." *Citizens for Better Forestry*, 341 F.3d at 971. Moreover, "this type of 'procedural' injury is tied to a substantive 'harm to the environment'—'the harm consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment.'" *Id.* (citations and internal quotation marks omitted).

That added risk has been realized here, with OB/OD operations on Tarague Beach continuing beyond the 2018 Permit's expiration based on the decision the Air Force reached without NEPA compliance. Ex. 3. Because those OB/OD operations threaten cultural and natural

resources on which Prutehi Litekyan relies, Plaintiff suffers harm from Defendants' NEPA violations. *See* ECF 1 ¶¶ 9-18.

Even if the Air Force could not proceed until it receives a new RCRA permit, the failure to comply with NEPA before deciding how (OB/OD) and where (Tarague Beach) to carry out disposal would still constitute final agency action. The Eighth Circuit addressed a similar situation in *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808 (8th Cir. 2006), which challenged the Army Corps' failure to prepare an EIS before deciding to construct a levee. *Id.* at 811. The government claimed there was "no final agency action by the Corps because it has not entered into a Project Cooperation Agreement with Jefferson City nor received necessary funding from Congress," both of which were necessary before the agency could build the levee. *Id.* at 812. The Eighth Circuit concluded:

> To deny judicial review of the agency's NEPA compliance because additional steps are required before the levee can be built would undermine the purpose of judicial review under NEPA—to "ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."

*Id.* at 816 (quoting *Robertson*, 490 U.S. at 349).

Allowing action agencies to evade NEPA just because the destructive projects they propose need a permit, as Defendants urge, would open a massive loophole, subverting NEPA's command for "*all* [Federal] agencies" to conduct environmental review of "*every* recommendation or report on proposals for … major Federal actions." 42 U.S.C. § 4332(2) (emphasis added); *see LaFlamme,* 852 F.2d at 398 (NEPA's mandate liberally construed). Judicial decisions should not "creat[e] loopholes that undermine [a] statute's basic federal regulatory objectives." *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1477 (2020).

17

The Ninth Circuit has "held that an agency's decision not to issue an EIS concludes the agency's procedural inquiry into the environmental impact of a proposed project and therefore constitutes a final agency action," conferring jurisdiction. *Rattlesnake Coal. v. U.S. Envtl. Prot. Agency*, 509 F.3d 1095, 1104 (9th Cir. 2007). Likewise, an agency's failure "to initiate the NEPA process" in the first place "satisfies the final agency action requirement." *Citizens for Clean Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264, 1281 (D. Mont. 2019); *see also id.* at 1279 ("Federal Defendants failed to initiate a single step of the NEPA process in relation to the [challenged] Order"); 5 U.S.C. § 551(13) (under APA, "agency action" includes "failure to act").

Until this Court reviews the administrative record, it cannot determine if Defendants "made a conscious decision not to initiate the NEPA process" or simply did not give NEPA any thought. *Citizens for Clean Energy*, 384 F. Supp. 3d at 1281. Either way, Defendants cannot evade judicial review. "[T]the absence of a formal statement of the agency's position" regarding whether a NEPA analysis is required would "not [be] dispositive." *Her Majesty the Queen in Right of Ontario v. U.S. Envtl. Prot. Agency*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). "When administrative inaction has the same impact on the rights of the parties as an express denial of relief, judicial review is not precluded." *Id.* A contrary holding would create a perverse incentive for agencies to ignore NEPA altogether, avoiding judicial review, rather than be subject to scrutiny when they try to comply with the law and their efforts fall short.

Even if "the challenged agency action" were, as Defendants claim, "the Application submitted to Guam EPA," it would still constitute final agency action. ECF 19 at 14. Defendants implicitly concede that the application "mark[ed] the 'consummation' of the [Air Force's] decisionmaking process" regarding OB/OD at the EOD Range, contesting only whether *Bennett*'s second prong—that "legal consequences will flow" from the application—is satisfied.

*Id.* (quoting *Bennett*, 520 U.S. at 178).[9] Defendants' litigation position that "the Application itself does not allow Defendants to dispose of waste munitions," ECF 19 at 14, cannot be squared with their out-of-court actions, where the Air Force claims a legal right to conduct OB/OD—and, in fact, "continues to operate the Open Burn/Open Detonation Facility"—based on the permit renewal application. Ex. 3. Defendants are not, as they claim, "in the same position they were in before [the] application was submitted." ECF 19 at 14. Without the application, all OB/OD operations (other than training that is exempt from RCRA) would have had to cease on September 3, 2021, when the 2018 permit expired. *See* 40 C.F.R. §§ 270.1(c), 270.30(b); Ex. 2 at 2-002 to -003, 2-022 (¶¶ I.E.2, I.E.3).[10] The application undeniably had legal consequences, allowing destructive OB/OD activities on Tarague Beach to continue.[11]

Because the challenged action—Defendants' failure to comply with NEPA—constitutes final agency action and, in the alternative, the application itself also satisfies *Bennett*'s legal consequences requirement, this lawsuit challenges final agency action, conferring jurisdiction.

## VII.    PRUTEHI LITEKYAN HAS STANDING

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

---

[9] Whether Guam EPA has made a final permitting decision has no bearing on whether the Air Force—as the agency proposing to undertake action—has made "a definitive statement of the agency's position" regarding how and where to dispose of hazardous waste explosives. *Indust. Customers of NW. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005).

[10] Even if Defendants did not claim a legal right to conduct OB/OD due to submission of the renewal application, the application "changed the status quo" that would have existed without it by opening the door to continued OB/OD operations on Tarague Beach. *See Citizens for Clean Energy*, 384 F. Supp. 3d at 1278 (Secretary's lifting of coal leasing moratorium had legal consequences, even though lifting moratorium did not by itself grant any individual coal leases).

[11] If the Court concludes the complaint requires allegations about these legal consequences, it should grant leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

19

favorable judicial opinion." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Defendants do not question that Prutehi Litekyan—a Guam-based organization whose members suffer cultural, social, spiritual, health, professional, scientific, recreational, aesthetic, economic, and other harm from OB/OD operations on Tarague Beach—has established the requisite injury in fact. *See* ECF 1 ¶¶ 9-18; *see also Levine v. Vilsack*, 587 F.3d 986, 991 (9th Cir. 2009) ("Where standing is raised in connection with a motion to dismiss," court "accept[s] as true all material allegations of the complaint") (citations omitted). Instead, Defendants contend that, because OB/OD will occur only if Guam EPA issues a new permit, "Plaintiff cannot establish either causation or redressability." ECF 19 at 17.

Defendants' argument that "the harms Plaintiff alleges cannot occur as a result of Defendants' submission of the now-pending Application to Guam EPA" ignores that the Air Force has continued to conduct OB/OD on Tarague Beach beyond the 2018 Permit's expiration precisely because of its permit renewal application. ECF at 17; *see* Ex. 3 (citing 40 C.F.R. § 270.51(d)). Defendants' decision to submit that application, without NEPA compliance, is currently inflicting harm on Prutehi Litekyan, and those injuries are caused by the Air Force, not "a third party not before this Court." ECF 19 at 17.

Defendants correctly acknowledge that the causation and redressability requirements are relaxed in NEPA cases. *Id.* at 16. "This is so because environmental plaintiffs cannot show that compliance with NEPA would have changed the agency's decisions." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021) ("*Whitewater*"). Accordingly, to have standing, Prutehi Litekyan need only "make some showing of how the agency's failure to account for environmental consequences affects them … ." *Id.* Plaintiff "also

20

must be able to show that if the agency agreed that environmental harms flowed from its decision, that the agency was capable of redressing those harms." *Id.*

Prutehi Litekyan easily satisfies those relaxed standing requirements. Defendants' arguments regarding standing ignore that the proposal to conduct OB/OD on Tarague Beach originated with the Air Force, not Guam EPA. This is not a situation where an "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of ***someone else***," which was the situation in *Whitewater*. *Id.* (citation omitted).[12] Rather, Prutehi Litekyan's injuries are a result of Defendant Air Force's decision—without NEPA analysis—to conduct OB/OD. As the project proponent that will "directly undertake[]" OB/OD (and, moreover, currently is conducting such operations), the Air Force was obliged to prepare its NEPA analysis "at the feasibility analysis (go/no-go) stage," *i.e.*, ***before*** it submitted a permit renewal application to Guam EPA that has resulted in destructive OB/OD occurring on Tarague Beach after the 2018 Permit expired. 40 C.F.R. § 1502.5(a); *see id.* § 270.51(d); Ex. 3.

Regarding causation, had the Air Force complied with its duty to consider "alternatives that might be pursued with less environmental harm," it might have opted to treat munitions at alternate locations (including locations off Guam, which might not require any permit from Guam EPA) or using an environmentally safer technology, avoiding harm to Prutehi Litekyan. *Lands Council*, 395 F.3d at 1027. Prutehi Litekyan's injuries are thus "fairly traceable to the challenged conduct of the [Air Force]," *Spokeo*, 136 S. Ct. at 1547, whose "failure to account for environmental consequences" adversely affects Prutehi Litekyan. *Whitewater*, 5 F.4th at 1013.

---

[12] If "how Guam EPA will likely react to this Application" were relevant, the fact that Guam EPA has renewed the permit every three years for nearly four decades is compelling evidence of how the latest application will likely fare. ECF 19 at 17; *see also* ECF 1 ¶ 45.

Even if 40 C.F.R. § 270.51(d) does not apply, and OB/OD cannot legally occur until Guam EPA issues a permit, that would not mean, as Defendants claim, that Prutehi Litekyan "lacks standing because no injury is certain to occur until … additional steps to finalize the … project" are taken. *Sierra Club*, 446 F.3d at 816. "Injury under NEPA occurs when an agency fails to comply with that statute … ." *Id.* "The injury-in-fact is increased risk of environmental harm stemming from the agency's allegedly uninformed decisionmaking." *Id.*; *see Citizens for Better Forestry*, 341 F.3d at 971 (same). Prutehi Litekyan suffered further injury when it was "deprived of the opportunity to comment" on NEPA analysis before the Air Force decided to conduct OB/OD. *Id.* at 970; *see id.* at 971 ("Standing may properly hinge on this type of injury").

Finally, to establish redressability, Prutehi Litekyan "need not show that further analysis by the government would result in a different conclusion." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). "It suffices that, as NEPA contemplates, the [Air Force's] decision ***could be influenced*** by the environmental considerations that NEPA requires an agency to study." *Id.* (emphasis added). As the project proponent, the Air Force is "capable of redressing [the] harms" associated with OB/OD on Tarague Beach by selecting an alternate location and/or technology to treat hazardous waste explosives. *Whitewater*, 5 F.4th at 1013.

VIII.    PLAINTIFF'S CHALLENGE TO DEFENDANTS' NEPA VIOLATIONS IS RIPE

Plaintiff's challenge to the Air Force's NEPA violations is ripe because (1) "delayed review would cause hardship;" (2) judicial review would not interfere with the Air Force's decision-making, which is complete; and (3) there is no need for "further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

Defendants' claim that Prutehi Litekyan would not suffer hardship from delayed review largely rehashes their flawed arguments regarding final agency action and standing. ECF 19 at

18. Defendants' out-of-court actions belie their litigation claim that the Air Force "cannot operate the OB/OD Facility on the basis of the Application alone." *Id.* at 18; *see* Ex. 3. This case bears no relation to *Ohio Forestry*, where the challenged forest plan did not "inflict[] significant practical harm" on the plaintiff's interests because, "before the Forest Service can permit logging, it must focus upon a particular site [and] propose a specific harvesting method." 523 U.S. at 733-34. The Air Force has already made a site-specific decision to conduct OB/OD on Tarague Beach, and that decision has already inflicted procedural harm, as well as on-the-ground harm from continued disposal of hazardous waste explosives. *See* Parts VI and VII, *supra*.

Regarding the second factor, Prutehi Litekyan challenges the Air Force's actions, not Guam EPA's. The question is not, as Defendants assert, if judicial review "would inappropriately interfere" with Guam EPA's permitting process. ECF 19 at 19. Rather, it is whether "immediate judicial review … could hinder [the Air Force's] efforts to refine its policies." *Ohio Forestry*, 523 U.S. at 735. It is undisputed that the Air Force has already finalized its decision about how and where to dispose of munitions; it already is actively implementing that decision. The Air Force has no ongoing decision-making process that judicial review could even arguably hinder.

In discussing the third factor, the Supreme Court in *Ohio Forestry* distinguished cases bringing substantive challenges to agency decisions from cases involving NEPA, which "simply guarantees a particular procedure, not a particular result." 523 U.S. at 737. The Court noted that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* The Ninth Circuit has "adopted this dicta from *Ohio Forestry*," applying it to conclude that cases like this one that "rais[e] a procedural injury" are ripe, regardless of "the imminence or lack thereof of site-specific action." *Citizens for Better Forestry*, 341 F.3d at 977.

23

IX.     THIS LAWSUIT CHALLENGES MAJOR FEDERAL ACTION

Under NEPA, "*[m]ajor Federal action* … means an activity or decision subject to Federal control or responsibility." 40 C.F.R. § 1508.1(q). It includes "new and continuing activities, including projects and programs … conducted … by Federal agencies." *Id.* § 1508.1(q)(2). The Air Force's decision to conduct OB/OD at the EOD Range for an additional three years fits squarely within that definition.

The Air Force's decision also satisfies the requirement to "result[] in final agency action under the [APA]." *Id.* § 1508.1(q)(1)(iii). As discussed in Part VI, *supra*, the Air Force's first step in implementing that decision—submission of the permit renewal application—has already had the requisite legal consequences for final agency action, allowing OB/OD activities to continue after the 2018 Permit expired on September 3, 2021. *See id.* § 270.51(d).

The Air Force's decision has also resulted in an "irreversible and irretrievable commitment of resources." *Conner*, 848 F.2d at 1446. Defendants acknowledge that, based on the challenged decision, OB/OD activities at the EOD Range have continued for the past eight months, after the 2018 Permit expired. Ex. 3. The detonation of hazardous waste explosives on the bare sand is undeniably "surface-disturbing activity," *Conner*, 848 F.2d at 1447, and the Air Force has already gone well beyond "the go/no go point of commitment," *id.* at 1448.

Even if the Air Force had to hold off on OB/OD operations until Guam EPA issues a new permit, the decision to conduct OB/OD would still qualify as a "major Federal action." NEPA does not require the Air Force's decision to ***be*** a final agency action before requiring environmental review; it just needs to "***result[] in*** final agency action." 40 C.F.R. § 1508.1(q)(1)(iii) (emphasis added). Defendants' contrary construction would contravene the statute's plain language, which requires NEPA analysis for all "***proposals*** for … major Federal actions." 42 U.S.C. § 4332(2)(C) (emphasis added). That analysis must disclose "any adverse

24

environmental effects which cannot be avoided ***should the proposal be implemented***." *Id.* §
4332(2)(C)(ii) (emphasis added); *see also* S. Rep. No. 91-296, at 20 (1969) ("Each agency which
proposes any major actions … shall make a determination as to whether the proposal would have
a significant effect upon the quality of the human environment"). Federal agencies must
"integrate the NEPA process with other planning ***at the earliest possible time*** to insure that
planning and decisions reflect environmental values." *Andrus*, 442 U.S. at 351 (emphasis added;
citation omitted). It is the proposal to take major federal action, not the subsequent
implementation of that proposal, that triggers the duty to comply with NEPA.

The permitting cases Defendants cite are distinguishable because the Air Force here is the
action agency that itself proposes to conduct a destructive activity, not a regulatory agency that
has reserved the right to prevent that action from proceeding. NEPA's statutory language broadly
encompasses all "proposals for … major Federal actions." 42 U.S.C. § 4332(2)(C). It does not
create a loophole that would allow action agencies to evade their duty to conduct environmental
review merely because they need a permit before they can carry out proposed actions that may
"significantly affect[] the quality of the human environment." *Id.*; *see Sierra Club*, 446 F.3d at
816 (Army Corps obliged to comply with NEPA even though "additional steps are required
before the levee can be built"); *Metcalf*, 214 F.3d at 1143 (agency decision to support whale hunt
was "irreversible and irretrievable commitment of resources" triggering NEPA even though hunt
could not occur without International Whaling Commission permission).

X.      CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion and decide on the
merits, based on the record, whether the Air Force violated NEPA when it decided—without any
NEPA analysis or public input—to conduct another three years of OB/OD on Tarague Beach.

25

DATED: May 2, 2022.

/s/ David L. Henkin
DAVID L. HENKIN (HSBA #6876)
Admitted *Pro Hac Vice*
THIEN T. CHAU (CSBA #330315)
Admitted *Pro Hac Vice*
EARTHJUSTICE

*Attorneys for Plaintiff Prutehi Litekyan: Save Ritidian*

/s/ Rachel M. Taimanao-Ayuyu
RACHEL M. TAIMANAO-AYUYU (GBA #07097)
THE LAW OFFICE OF RACHEL TAIMANAO-AYUYU

*Local Counsel for Plaintiff Prutehi Litekyan: Save Ritidian*

26